THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | 3:22-CR-253 |
| v. | : | (JUDGE MARIANI) |
| | : | |
| **JON ROBERT DONOHUE,** | : | |
| | : | |
| **Defendant.** | : | |

FILED
SCRANTON
NOV 27 2024
PER _____
DEPUTY CLERK

## MEMORANDUM OPINION
### I. INTRODUCTION

Here, the Court considers Defendant's Motion to Suppress and Dismiss Indictment (Doc. 42) filed on April 17, 2024. With the Motion, Defendant seeks suppression of evidence seized during the May 2022 search of his house based on his assertion that the search was not supported by reasonable suspicion. The search occurred while Defendant was on house arrest monitoring pursuant to a sentence imposed in the Luzerne County Court of Common Pleas and was prompted by an email sent to the Luzerne County Probation and Parole Department's house arrest office indicating that Defendant was selling drugs and was in possession of guns. When the initial warrantless search conducted by probation officers revealed prohibited items, the probation officers stopped the search at the suggestion of a Pittston City police officer so that a search warrant could be obtained. The later search conducted pursuant to the warrant revealed additional firearms and drugs. Based on the results of the search, Defendant was charged and detained by Pittston City police officers. The items seized gave rise to this federal prosecution in which Defendant is charged with

Possession with Intent to Distribute a Controlled Substance, Possession of a Firearm in Furtherance of Drug Trafficking, and Prohibited Person in Possession of a Firearm. (*See* Doc. 1.)

The Court held an Evidentiary Hearing on Defendant's pending Motion on September 18, 2024. Thereafter, the parties filed supplemental briefs. (*See* Docs. 70, 71.) For the reasons discussed below, the Court will deny Defendant's Motion.

## II. BACKGROUND[1]

In the underlying state court action, Judge Joseph F. Sklarosky, Jr. of the Luzerne County Court of Common Pleas, sentenced Defendant on November 18, 2021, on two separate counts of firearms not to be carried without a license in violation of 18 Pa. C.S.A. § 6106. (Doc. 70 at 1 (citing Gov't's Ex. 1).[2]) On the case docketed at 440-19, Defendant was sentenced to a term of 24 months' probation. (*Id.*) On the case docketed at 698-21, Defendant was sentenced to 36 months' intermediate punishment with nine months of house arrest monitoring. The sentences were ordered to run concurrent with one another, and his aggregate sentence totaled three years. (*Id.*) Defendant was serving the house-

---

[1] The Court finds no disagreement with the facts presented in the Factual Background set out in the Government's Supplemental Brief in Opposition to Defendant's Motion to Suppress Evidence (Doc. 70 at 1-8). Because the Court concludes that the Government accurately summarizes testimony and evidence presented, the Court, in part, cites to relevant portions of the Government's recitation.

[2] Unless otherwise identified, Government exhibits cited in this Memorandum Opinion refer to exhibits admitted at the September 18, 2024, hearing.

arrest-monitoring portion of his sentence in May 2022 when the search at issue occurred. (*See, e.g.*, Hr'g Tr. 23:1-14.)

Nicholas Carey, the Luzerne County probation officer to whom Defendant's case was assigned on November 19, 2021, attempted to contact Defendant by telephone to schedule an initial appointment on November 22, 2021, and November 29, 2021. (Hr'g Tr. 12:1-11, Doc. 66.) In both instances, Defendant did not answer and his voicemail was full. (*Id.*) Therefore, Officer Carey sent a letter to Defendant directing him to report to the probation office for intake on December 9, 2021. (Hr'g Tr. 12:11-13, 15:25-16:1.)

Before the initial appointment, Officer Carey received a call from a woman who identified herself as Tammy Campanaro, Defendant's mother. (Hr'g Tr. 13:2-10.) During the call, which lasted approximately twenty minutes, Ms. Campanaro

> had many concerns at the time. She reached out hoping that Jon would get help being on probation. She'd gone into significant detail about his past. She mentioned there was some potential sexual abuse as a child. She mentioned a prior drug charge when he was also a juvenile. She was very emotional on the phone. She was concerned for Jon's well-being and wanted him to get help.

(Hr'g Tr. 13:22-14:3.) Officer Carey found her credible because "she knew [Defendant's] background, stuff that's not general knowledge as far as prior records [and] concern for his safety is definitely something that stuck out." (Hr'g Tr. 14:25-15:3.) Ms. Campanaro ended the telephone conversation by acknowledging she was aware of her son's scheduled intake appointment and confirmed that her son would be attending the meeting. (Hr'g Tr. 15:4-7.)

3

Id. at 15.) The call lasted approximately twenty minutes. (Hr'g Tr. 15:9.) The caller did not spell her name during the call and Officer Carey testified that he did not know the proper spelling of her name. (Hr'g Tr. 56:11-15.)

On December 9, 2021, Defendant appeared for his intake appointment with Officer Carey. (Hr'g Tr. 16:1.) During the meeting, Officer Carey apprised Defendant of the fact that he had spoken to the defendant's mother a week earlier and Defendant reportedly replied, "Oh, okay." (Hr'g Tr. 17:3-5.) Defendant told Officer Carey that he was living with his father, Joseph Donohue, at 62 Williams Street, Apartment Two, Pittston, Pennsylvania, and his father would be his emergency contact. (Hr'g Tr. 8-13.)

At the intake meeting, Officer Carey reviewed the rules and regulations regarding supervision, a written copy of which was given to Defendant. (Hr'g Tr. 17:14-18:17.) Officer Carey testified that Defendant acknowledged his understanding of the rules and regulations reviewed and signed the document. (Hr'g Tr. 18:18-23.) Officer Carey stated that an offender must call in when he intends to move but the rules are not reviewed again because the rules apply to a person, not to an address. (Hr'g Tr. 19:22-24.)

Officer Carey testified that conditions of Defendant's supervision included the following: he was to refrain from the unlawful possession and consumption and sale of illegal drugs, mood altering herbal or synthetic substances, drug paraphernalia and/or prescription drugs unless medically prescribed and reported to LCAPPD within 24 hours"; he was to submit to random drug testing; and he was not to possess or have any contact

4

with firearms or deadly weapons or be in a residence in which firearms were present. (Hr'g Tr. 20:6-21:8.) Failure to abide by these rules would be a violation of the conditions of supervision and failure to submit to random drug testing when ordered to do so could also be a violation. (*Id.*) The "Rules and Regulations: Conditions of Supervision" which Officer Carey reviewed included the following provision:

> If [the Luzerne County Probation and Parole Department] has reasonable suspicion, you are subject to search of your person, place of residence, or vehicle without a warrant. Items that constitute a violation of your probation/parole or the law are subject to seizure and will be used as evidence against you.

(Gov't's Ex. 3 at 2 ¶ 12.)

On December 10, 2021, the day after his appointment, Defendant called Officer Carey to report that he was moving to a residence located at 49 Market Street, Pittston, Pennsylvania. (Doc. 70 at 5 (citing Gov't Ex. 2 at 8).) The request was approved and Defendant remained on electronic monitoring at his new residence and was subject to the same conditions of supervision that he acknowledged on December 9, 2021. (Hr'g Tr. 23:5-14.)

Officer Carey identified several instances of non-compliance during Defendant's supervision stating that Defendant "had a couple of house arrest violations as far as being out of range, which means he left his residence without an approved schedule from our department, and he also missed a drug test on May 2nd that I directed him to report to." (Hr'g Tr. 23:19-22.) Officer Carey further stated that "[m]issing a drug test is very concerning

5

especially when you're directed to do so. Missing a drug test makes us believe you are either hiding something or you might have used something." (Hr'g Tr. 23:25-24:3.)

On May 9, 2022, Officer Carey received an email forwarded from Carmen Lopresto, the Chief of the Luzerne County Probation and Parole Department. (Hr'g Tr. 24:10-20.) The original email was sent from email address "tammycamparno@gmail.com" on Friday, May 6, 2022, at 10:49 p.m. to "EMLuzerne@cdibtm.com" (the generalized e-mail of probation's house arrest office) with the subject "Drug dealer and guns." (Hr'g Tr. 24:10-26:9.) The body of the email stated as follows:

> Jon Donahue lives at 49 Market St. Pittison Pennsylvania 18640. Jon Donahue is on House Arrest for 3 years for having a gun..He is selling Cocain, Molly, Weed, Meth and pills and has a few guns. His dad is helping him run drugs and cash around for Jon Donahue because of being on House Arrest...Someone I care about almost died from buying meth that had Fental in the shit! Do something please??

(Gov't's Ex. 4 (typos in original).)

Officer Carey recognized the name of the sender as Defendant's mother with whom he had spoked before Defendant's initial intake. (Hr'g Tr. 25:16-22.) He found the email credible for several reasons, stating that "the last sentence is the most outstanding part of it, but also the knowledge of Mr. Donohue's sentence, which is not public knowledge. She knows his address which is not public knowledge." (Hr'g Tr. 28:1-8.)

After discussing the case with his supervisors, Officer Carey was given authorization to proceed to the defendant's residence to perform a search. (Hr'g Tr. 29:18-22.) As per

6

policy, Officer Carey contacted Pittston City police to accompany him and other probation officers to Defendant's residence. (Hr'g Tr. 30:4-14.)

Officer Carey reported that two police officers (Curtis Nocera and Jacob Wesolowski (Hr'g Tr. 78:10-23)) and two probation officers (Jessie Ragughini and Brian Altavilla) joined him at the Market Street address where he basically took charge of the scene. (Hr'g Tr. 30:22-31:1.) Upon arriving at the residence, Officer Carey knocked several times; when there was no answer, he was attempting to call Defendant on the phone when Defendant's father pulled up in front of the house and approached the officers, asking what they were doing there. (Hr'g Tr. 31: 7-16.) Officer Carey described Mr. Donohue's demeanor as "kind of agitated that we were there, questioning what we were doing." (Hr'g Tr. 32:1-2.)

Officer Carey testified that Defendant came outside after his father called him and directed him to do so, pulling the door closed behind him. (Hr'g Tr. 32:12-18.) Officer Carey described the defendant as appearing "very nervous," "very sketchy," and asked if "we can just leave the residence and go for the drug test he missed." (Hr'g Tr. 32:23-33:1.) He also said Defendant stated that when he closed the door it locked behind him. (Hr'g Tr. 32:24-25.) Eventually, Defendant permitted Officer Curtis Nocera of the Pittston City Police Department to unlock the front door using a card after which Probation Officers Carey, Ragughini and Altavilla entered the house and the Pittston City police officers stayed on the front porch. (Hr'g Tr. 33:8-24:2.)

7

Upon entering the residence, Officer Carey immediately noted a "very pungent smell of marijuana," and observed a digital scale, a "clear pill capsule" containing a "white substance" on a computer desk, two B.B. guns, samurai swords, and knives in plain view. (Hr'g Tr. 34:4-19.) On the second floor, firearms were found in the master bedroom closet as well as ammunition and a baggie full of empty pill capsules. (Hr'g Tr. 35:6-8.) Officer Carey testified that he called Officer Nocera upstairs after making these discoveries and Officer Nocera suggested that the probation officers should stop the search and obtain a search warrant for the entire house. (Hr'g Tr. 35:10-14.)

After this conversation, Officer Carey said that Defendant was taken downstairs and placed in handcuffs and the officers eventually moved to the front porch to wait for the search warrant. (Hr'g Tr. 35:20-36:1.) When the warrant arrived about two hours later, Officer Carey participated in the search as did members of the Luzerne County Task Force. (Hr'g Tr. 36:10-21.) In addition to the objects seen on the initial search, additional firearms and a briefcase containing numerous drugs and a ledger were found. (Hr'g Tr. 37:6-8.) Officer Carey testified that, at that point, Defendant was informed that he was going to be charged and detained by Pittston City police. (Hr'g Tr. 37:10-15.) He further testified that all items seized constituted violations of the terms and conditions of Defendant's supervision. (Hr'g Tr. 37:16-19.)

## III. ANALYSIS

Defendant's contention that the initial search of his residence was not supported by reasonable suspicion is the basis for his argument that the evidence found in his residence was unlawfully seized and must be suppressed pursuant to the Fourth and Fourteenth Amendments to the United States Constitution. (*See* Doc. 42 ¶¶ 45-50.) The Court concludes that Officer Carey had reasonable suspicion to search Defendant's residence.

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV.

In *Riley v. California*, 573 U.S. 373 (2014), the Supreme Court noted that the text of the Fourth Amendment "makes clear [ ] 'the ultimate touchstone of the Fourth Amendment is reasonableness.'" *Id.* at 381 (quoting *Brigham City v. Stuart,* 547 U.S. 398, 403 (2006)). *Riley* added that

> [o]ur cases have determined that "[w]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, ... reasonableness generally requires the obtaining of a judicial warrant." *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 653, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). . . . In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement. *See Kentucky v. King*, 563 U.S. [563 U.S. 452], 131 S.Ct. 1849, 1856–1857, 179 L.Ed.2d 865 (2011).

*Riley*, 573 U.S. at 382.

9

However, the Supreme Court has recognized exceptions to the warrant requirement where "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (internal citations omitted). *Griffin* found that "[a] State's operation of a probation system . . . presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." *Id.* at 873-74. "Supervision...is a 'special need' of the State permitting a degree of impingement upon privacy that would not be constitutional if applied to the public at large." *Id.* at 875. *Griffin* noted that the permissible degree of impingement "is not unlimited," *id.,* further explaining that

> [a] warrant requirement would interfere to an appreciable degree with the probation system, setting up a magistrate rather than the probation officer as the judge of how close a supervision the probationer requires. Moreover, the delay inherent in obtaining a warrant would make it more difficult for probation officials to respond quickly to evidence of misconduct . . . and would reduce the deterrent effect that the possibility of expeditious searches would otherwise create . . . .

*Id.* at 876 (internal citations omitted).

In keeping with this general assessment, the Court discussed reasonableness in the probation context, i.e., "a situation in which there is an ongoing supervisory relationship—and one that is not, or at least entirely, adversarial—between the object of the search and the decisionmaker," 483 U.S. at 879.

> In such circumstances it is both unrealistic and destructive of the whole object of the continuing probation relationship to insist upon the same degree of

> demonstrable reliability of particular items of supporting data, and upon the same degree of certainty of violation, as is required in other contexts. In some cases-especially those involving drugs or illegal weapons-the probation agency must be able to act based upon a lesser degree of certainty than the Fourth Amendment would otherwise require in order to intervene before a probationer does damage to himself or society. The agency, moreover, must be able to proceed on the basis of its entire experience with the probationer, and to assess probabilities in the light of its knowledge of his life, character, and circumstances.
>
> . . . . [B]ecause it is the very assumption of the institution of probation that the probationer is in need of rehabilitation and is more likely than the ordinary citizen to violate the law, we think it enough if the information provided indicates, as it did here, only the likelihood ("had or might have guns") of facts justifying the search.

*Griffin*, 483 U.S. at 879-80.[3]

A court assesses the reasonableness of a search by looking at the totality of the circumstances, including "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *United States v. Knights*, 534 U.S. 112, 118–19 (2001) (internal quotation omitted); *see also United States v. Henley*, 941 F.3d 646, 650 (3d Cir. 2019) (quoting *Knights,* 534 U.S. at 118-19*). Knights* explained that

---

[3] While the specific standard at issue in *Griffin* was "reasonable grounds" and here it is "reasonable suspicion," the distinction between the two which Defendant seeks to establish (*see* Doc. 71 at 3) does not undermine the guidance provided by the Court's general consideration of the probation status and relationship between the probation officer and probationer. Further, Third Circuit decisions applying *Griffin* and using the "reasonable suspicion" standard to assess the constitutional validity of searches conducted in the probation context indicate that Defendant's distinction is not dispositive. *See, e.g., United States v. Manuel*, 342 F. App'x 844, 848 (3d Cir. 2009); *United States v. Wormsley*, 708 F. App'x 72, 74 (3d Cir. 2017).

11

[t]he State has a dual concern with a probationer. On the one hand is the hope that he will successfully complete probation and be integrated back into the community. On the other is the concern, quite justified, that he will be more likely to engage in criminal conduct than an ordinary member of the community. The view of the Court of Appeals in this case would require the State to shut its eyes to the latter concern and concentrate only on the former. But we hold that the Fourth Amendment does not put the State to such a choice. Its interest in apprehending violators of the criminal law, thereby protecting potential victims of criminal enterprise, may therefore justifiably focus on probationers in a way that it does not on the ordinary citizen.

We hold that the balance of these considerations requires no more than reasonable suspicion to conduct a search of this probationer's house. The degree of individualized suspicion required of a search is a determination of when there is a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable. See *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) (individualized suspicion deals "with probabilities"). Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term "probable cause," a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable. See, e.g., *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Those interests warrant a lesser than probable-cause standard here. When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable.

*Knights,* 534 U.S. at 120-21.

Further explaining the "reasonable suspicion" standard, *Henley* stated that

[w]e determine whether reasonable suspicion exists by context and "commonsense," *Illinois v. Wardlow,* 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), mindful that it is something less than what is "required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable," *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). Thus, an officer needs only "a particularized and objective basis for suspecting legal wrongdoing," *United*

12

> States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (internal quotations omitted).
>
> Parole agents, like other law enforcement officers, should "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Arvizu, 534 U.S. at 273, 122 S.Ct. 744 (quoting United States v. Cortez, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

Henley, 941 F.3d at 651–52.[4]

Applying these principals to the case at bar, the Court first identifies the information known to Officer Carey.

- Defendant had been difficult to contact for his initial appointment. (Hr'g Tr. 12: 5-19.)

- Defendant was on probation for two separate firearms offenses and had a juvenile drug distribution offense. (Hr'g Tr. 7:19-24.)

- Based on a December 2021 telephone conversation with a woman who credibly identified herself as Defendant's mother, Officer Carey knew that the caller was worried about Defendant, was concerned for his safety, and wanted him to get help. (Hr'g Tr. 14:1-3, 15:1-3.)

---

[4] Because the "reasonable suspicion" standard is applied in both probation and parole contexts, the Court draws no meaningful distinction between the two for purposes of the case at bar where Defendant was on home confinement, a status considered analogous to people on parole as far as the individual's expectations of privacy. See, e.g., United States v. Beechler, 68 F.4th 358, 366 (7th Cir. 2023).Thus, the Court rejects Defendant's argument that "parole is seen as a privilege of the incarcerated and probation is a sentence that is an incarceration alternative . . . by normal logic [probation] allow[s] less restriction and more rights to the individual on probation than the similarly situated individual on parole." (Doc. 71 at 4-5.) Consistent with the Court's assessment of a sentence of home confinement, when asked whether house arrest was more restrictive than probation, Officer Carey said "Yes, . . . [i]t is technically a jail sentence in your home." (Hr'g Tr. 9:22-24.)

- Officer Carey knew of several instances of noncompliance where Defendant left his residence without approval. (Hr'G Tr. 23:19-21.)

- On May 2, 2022, Defendant missed a scheduled drug test of which he had been notified, an event which Officer Carey testified "makes us believe you are either hiding something or you might have used something." (Hr'g Tr. 23:23-24:9.)

- On May 9, 2022, Officer Carey received an email forwarded to him from the chief of probation, Carmen Lopresto. (Hr'g Tr. 24:10-18.) The original email was sent from email address "tammycamparno@gmail.com" on Friday, May 6, 2022, at 10:49 p.m. to "EMLuzerne@cdibtm.com" (the generalized e-mail of probation's house arrest office) with the subject "Drug dealer and guns." (Hr'g Tr. 24:10-26:9.) The body of the email informed the reader that Defendant was selling drugs and had weapons. *See supra* p. 6. Officer Carey recognized the name of the sender as Defendant's mother with whom he had spoken before Defendant's initial intake and found the email credible. (Hr'g Tr. 25:16-22, 28:1-8.)

- After discussing the case with his supervisors, Officer Carey was given authorization to proceed to the defendant's residence to perform a search. (Hr'g Tr. 29:18-22.)

- Defendant did not come to the door when Officer Carey knocked several times. (Hr'g Tr. 31:7-11.)

- Defendant's father, who was identified in the email as "helping Jon run drugs and cash around" (Gov't's Ex. 4) arrived at the scene as Officer Carey was attempting to

14

call Defendant on the phone, and Officer Carey assessed Defendant's father to be "kind of agitated that we were there, questioning what we were doing." (Hr'g Tr. 32:1-2.)

- Defendant did not come outside until his father called him and directed him to do so, and Defendant pulled the door closed behind him, thereafter appearing very nervous and indicating the door was locked and could not be opened. (Hr'g Tr. 32:12-33:11.)

- Defendant permitted Pittston City police officer Curtis Nocera to open the door using a card and the probation officers then commenced the search.

Considering the totality of the circumstances, the Court concludes that Officer Carey had reasonable suspicion to conduct the search of Defendant's residence. Looking at the context in which the search was commenced and a commonsense analysis of the information he possessed at the time, Officer Carey had "a particularized and objective basis for suspecting legal wrongdoing." *Wardlow*, 528 U.S. at 125; *Arvizu*, 534 U.S. at 273. As set out above, the email which prompted the search was received just days after Defendant had failed to show up for a drug screen, an event which Officer Carey described as "very concerning" and gives rise to the probation officer's belief that the probationer may be "hiding something" or "us[ing] something." (Hr'g Tr. 23:25-24:3.) The email appeared to be from the same woman who had identified herself as Defendant's mother in a previous telephone call and contained specific information about Defendant's residence and

sentence and identified behaviors in which Defendant had previously engaged. *See supra* p. 6.

Importantly, Officer Carey testified about why he found the email credible as shown by the following dialogue.

Q. Upon reading the e-mail, did you find its contents credible?

A. I did.

Q. Why?

A. Again, the last sentence is the most outstanding part of it, but also she has the knowledge of Mr. Donohue's sentence, which is not public knowledge. She knows his address, which is not public knowledge.

Q. How did the e-mail -- tone of the e-mail as you read it compare to the conversation you had had with a woman who identified herself as Tammy Camparno?

A. The e-mail is very concerning as well as the phone call was.

Q. Did the e-mail echo any of the same concerns over the phone when you first spoke with her?

A. It did. It shows he had a drug history and also possession of firearms.

Q. Upon receiving this e-mail, what, if any, concerns did you have at that time?

A. I had concerns that Jon was in violation of his supervision.

Q. And why did you believe that?

A. Just based on the e-mail and knowing the history if he did possess firearms and drugs in his home.

Q. The fact he was on house arrest, did that concern you at all?

16

> A. It did. So if you're on house arrest, you're not leaving your residence. Therefore, it brought it to our attention there might be contraband in the residence.
>
> Q. Would possession of, quote, a few guns, end quote, as stated in the e-mail -- would that be a violation of the conditions of the defendant's supervision?
>
> A. It would be.
>
> Q. Would selling, quote, cocaine, molly, weed, meth and pills be a violation of his conditions?
>
> A. It would.
> Q. Would associating with other individuals engaged in criminal activity be a violation of the conditions of his supervision?
>
> A. It would.

(Hr'g Tr. 28:1-29:15.)

Defendant characterizes the email as "a questionable 'tip' riddled with spelling errors and what would appear on the surface to be exaggerations (as the tipster listed every street drug known to man)" and criticizes Officer Carey's failure to contact Defendant's mother before acting on the email. (*See* Doc. 71 at 7.) However, Defendant's assessment does not undermine the Court's determination that Officer Carey had a particularized and objective basis for suspecting legal wrongdoing" in that, despite the alleged flaws, the fact remains that the email followed a missed drug screen and contained specific information about Defendant and his case and identified behaviors that clearly violated the conditions of

17

Defendant's supervision and serious violations of law.[5] Further, Defendant's behavior at the scene bolstered the suspicion that Defendant was engaging in activity which violated the conditions of his supervision and that a search of his residence was warranted at the time it was conducted.

---

[5] The Court recognizes the spelling errors in the email. However, the spelling errors do not negate the accuracy of other information in the email or the seriousness of the wrongdoing identified and the fact that the alleged wrongdoing is consistent with Defendant's previous illegal behavior. While the email address spelling of Defendant's mother's name differs from the later-identified correct spelling of her name, Officer Carey testified that the caller who identified herself as Defendant's mother did not spell her name during the call and Officer Carey testified that he did not know the proper spelling of her name when he received the email. (Hr'g Tr. 43:17-18, 56:11-15.) Officer Carey also testified that there are "a lot of ways to spell Donohue" and he could not speculate as to the reason the author of the email whom he believed to be Defendant's mother would misspell Defendant's name ("Donahue" instead of "Donohue"). (Hr'g Tr. 43:19-44:6.) Officer Carey also testified that the misspelling did not prompt him to consider that there was a need to further investigate the origin of the email and he was focused on the content of the email rather that the typos it contained. (Hr'g Tr. 56:11-15; 58:3-5.)

Similarly, Defendant's mother's testimony that she neither called Officer Carey nor authored May 6, 2022, email (*see* Hr'g Tr. 99:4-8, 100:1-3) does not undermine Officer Carey's reliance on information gleaned from the phone call or the email. When he received the call, Officer Carey had no reason to suspect that the caller was not Defendant's mother and the record does not suggest that he ever had a basis to doubt that the call was from Defendant's mother.

While the lack of documentation of the phone call (*see* Hr'g Tr. 39:7-15) indicates that Officer Carey did not keep perfect records, the Court found his testimony about the phone call generally credible. Likewise, the Court found Officer Carey's testimony about the reason for referring to the email as anonymous to be credible and consistent with his explanation of department practice. (*See, e.g.*, Hr'g Trl 52:23-54:4.)

## IV. CONCLUSION

Because the search of Defendant's residence was supported by reasonable suspicion, the Court will deny Defendant's Motion to Suppress and Dismiss Indictment (Doc. 42). A separate Order will be entered.

_____
Robert D. Mariani
United States District Judge